IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ALEX SCHAUFFERT, <br>     Plaintiff/Counter-Defendant <br><br> v. <br><br> CERTAIN UNDERWRITERS AT <br> LLOYD'S, LONDON; GAB ROBINS <br> NORTH AMERICA, INC., <br>     Defendants <br><br> and <br><br> BRAUN CONSTRUCTION SERVICES, <br> INC., <br>     Defendant/Counter-Plaintiff[1] | ) <br> ) <br> ) <br> )    No. 3-09-0510 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

TO: The Honorable Todd J. Campbell, Chief Judge

REPORT AND RECOMMENDATION

By order entered September 3, 2010 (Docket Entry No. 82), the motion filed by defendant/counter-plaintiff Braun Construction Services, Inc. ("Braun") and defendant GAB Robins North America, Inc. ("GAB") to require the plaintiff to show cause why settlement agreement reached among the plaintiff and these defendants should not be enforced (Docket Entry No. 68) was referred to the Magistrate Judge with instructions to hold an evidentiary hearing and provide a Report and Recommendation. Pursuant to the order entered September 3, 2010 (Docket Entry No. 83), an evidentiary hearing was held on September 22, 2010, at which time the plaintiff and current counsel for the plaintiff appeared, along with counsel for Braun and GAB. Prior to the hearing, the plaintiff filed a response to the motion and an affidavit (Docket Entry Nos. 79-80), and subsequent to the hearing, the plaintiff filed another affidavit and supplemental response (Docket Entry Nos. 90 and 92).

---

[1] By orders entered December 23, 2009, and May 10, 2010 (Docket Entry Nos. 48 and 58), the cross-claims of Braun Construction Services against defendants Certain Underwriters at Lloyd's, London, and GAB Robins North America, Inc. were dismissed.

Although the motion seeking to require the plaintiff to show cause why the settlement agreement should not be enforced was effectively granted by the order scheduling the evidentiary hearing, the issue in dispute remains whether the parties entered into an enforceable settlement agreement, which shall be addressed herein.

I. Background

The plaintiff originally brought this action in state court and it was removed to this Court by the defendants. The plaintiff seeks damages for the cost of repair and rebuilding of a roof on an apartment building owned by the plaintiff that was damaged by water intrusion caused by rain and ice. The plaintiff sued its insurance carrier, defendant Certain Underwriters at Lloyd's London ("Lloyd's"), GAB, the local adjustor, and Braun, which had done emergency repairs to the building. Braun filed a counterclaim against the plaintiff for enforcement of its materialman's lien and damages for breach of contract and unjust enrichment (Docket Entry No. 11). Braun also filed crossclaims against Lloyd's and GAB for negligent misrepresentation, breach of implied contract, and promissory estoppel. Id. By order entered December 23, 2009 (Docket Entry No. 48), the motions of defendants Lloyd's and Braun to dismiss Braun's crossclaims were granted on Braun's claims for breach of contract and promissory estoppel, but denied on Braun's claims for negligent misrepresentation. Upon Braun's motion, the remaining crossclaims filed by Braun against Lloyd's and GAB were dismissed by order entered May 10, 2010 (Docket Entry No. 58).

According to counsel for Braun and GAB, on July 27, 2010, the plaintiff, plaintiff's former counsel, Michael Mills, and counsel for Braun and GAB participated in settlement discussions. Docket Entry Nos. 70-72. Counsel for Braun and GAB attest in their affidavits that terms of a settlement were discussed at that meeting and thereafter they requested and received approval of the settlement agreement from their clients and communicated with plaintiff's former counsel that Braun and GAB had agreed. Id. Braun and GAB contend that a settlement agreement was reached when counsel for the plaintiff called counsel for GAB and confirmed the settlement by letter faxed to

counsel for GAB on August 2, 2010, and corresponded with counsel for Braun on August 2, 2010, and August 3, 2010, confirming the settlement. Specifically, in pertinent part, plaintiff's counsel wrote to counsel for Braun and GAB on August 2, 2010, as follows:

> This will confirm the settlement of the claims among my client, GAB, and Braun Construction. Generally, GAB will pay fifty thousand dollars ($50,000.00) in full and final settlement of all claims by Schauffert against GAB. Braun, through their carrier, represented by John McReynolds, will pay twenty-five thousand dollars ($25,000.00) in settlement of Schauffert's claims against Braun. In addition, Schauffert and Braun agree to the "sliding scale" recovery discussed last week, on Braun's claim against Schauffert, based on the amount of [sic] Schauffert is able to make against Lloyd's. I will forward payment information to you under separate communication and will, of course, have Mr. Schauffert execute whatever Releases or Agreements are necessary to consummate this arrangement.

Defendants' Exhibit 1. That letter was sent to John Ray Clemmons, representing defendant Braun on the plaintiff's complaint, by facsimile, to John A. McReynolds, Jr., representing Braun on its counterclaim against the plaintiff, by email, William E. Godbold, III, representing GAB, by facsimile, and the plaintiff by facsimile.

On August 3, 2010, Mr. Clemmons wrote to Mr. Mills, Mr. McReynolds and Mr. Godbold, attaching the sliding scale language to which Mr. Mills referred in his August 2, 2010, letter that was presented at the meeting on July 27, 2010. Defendants' Exhibit 2. However, on August 12, 2010, counsel for the plaintiff filed a motion to withdraw (Docket Entry No. 67), and wrote to counsel for Braun and GAB by letter dated August 12, 2010, as follows:

> I am left in a position where I am not clear on Mr. Schauffert's position as to the settlement with your clients. The last position I got from him was that he was not in agreement about being in any contract to settle with you. My efforts to clarify that have been completely unsuccessful. He picked up his file, and efforts to communicate by several means have also been totally unsuccessful. I have no choice but to ask the Court to allow me to withdraw.

Docket Entry No. 69-4.

The motion of plaintiff's counsel to withdraw was granted by order entered August 17, 2010 (Docket Entry No. 73), and new counsel entered an appearance on behalf of the plaintiff on August 19, 2010 (Docket Entry No. 76).

Prior to the September 22, 2010, evidentiary hearing, the plaintiff filed an affidavit, outlining his verbal and email communications with his former counsel in which he represented that he had relayed to his counsel that he did not intend to be bound by any settlement until he received a settlement agreement in writing and had agreed to all "important and material terms" and that his counsel did not otherwise have authority to bind him to a settlement. Docket Entry No. 79, at 5, § 14. In his affidavit, the plaintiff attested that he had "no idea on what terms these proposed settlements are supposedly based upon other than some gross numbers . . . ." to which the plaintiff did not agree. Id., at § 15.

Therefore, in his response (Docket Entry No. 80) to the defendants' motion, the plaintiff argues that his former counsel did not have actual authority to enter into a settlement, that he did not have apparent authority because there were "numerous material terms" not included in the August 2, 2010, letter, including "issues of confidentiality, penalties for breach of confidentiality, availability of witnesses under the defendant's control, ongoing cooperation of defendants [and] disclosure of other agreements between the parties," and that the lack of such material terms renders any settlement agreement unenforceable since agreements involving certain sums of money and affecting real property, i.e., Braun's materialman's lien,, must be in writing in accord with the Tennessee Statute of Frauds. Id. at 4.

In reply (Docket Entry No. 84), defendants Braun and GAB contend that, even if the plaintiff's former attorney did not have actual authority, he had apparent authority, and that they may rely upon the apparent authority of the plaintiff's attorney, as his agent, unless they had reason to believe that he had no such authority.

At the evidentiary hearing, counsel for Braun chronicled the relevant recent history of settlement negotiations, beginning when counsel for Braun proposed a sliding scale so that Braun would receive a portion of any recovery that the plaintiff received from defendant Lloyd's, depending on the amount that the plaintiff recovered from Lloyd's, for Braun's counterclaim against the plaintiff. Counsel for Braun represented that the agreement was reduced to writing and

discussed at the office of Braun's counsel in the plaintiff's presence and a copy of the proposal was provided to plaintiff's attorney. Specifically, the proposal was for Braun to pay $25,000.00 and GAB to pay $50,000, and for the plaintiff to pay certain amounts to Braun depending upon the recovery received by the plaintiff from Lloyd's.

After the evidentiary hearing the plaintiff filed an affidavit, detailing the lack of "numerous important and material" aspects of the settlement agreement (Docket Entry No. 90), and the plaintiff filed a supplemental response (Docket Entry No. 92). Neither Braun nor GAB made any filing after the hearing.

## II. Testimony of Mr. Mills

Defendants called Mr. Mills to testify and through him four exhibits were introduced on behalf of the defendants and two exhibits were introduced on behalf of the plaintiff. No other witnesses testified on behalf of the defendants. The plaintiff did not testify nor did the plaintiff call any witnesses to testify on his behalf.

Mr. Mills testified that he had authority from the plaintiff to accept the offers of settlement based on his verbal conversation with the plaintiff on the telephone. Docket Entry No. 116, at 25-26. As a result, he wrote a letter dated August 2, 2010, to defendants' counsel, confirming the settlement of the claims among the plaintiff, GAB, and Braun, which he copied to the plaintiff. Defendants' Exhibit 1.

Mr. Mills attested to the accuracy of the affidavits filed by counsel for Braun and GAB (Docket Entry Nos. 70, 71, and 72), except that in his affidavit (Docket Entry No. 70), Mr. Clemmons omitted an additional conversation on August 2, 2010, when Mr. Mills called Mr. Clemmons to confirm that Braun's offer was still open. According to Mr. Mills, when Mr. Clemmons called back and confirmed that the offer remained on the table, Mr. Mills told Mr. Clemmons that he needed to make "one more phone call," whereupon Mr. Mills called the plaintiff again and asked the plaintiff if he had the authority to accept the settlement. Mr. Mills

5

testified that the plaintiff said, "Let me make this as simple as I can. You have authority to accept his deal," at which point Mr. Mills told the plaintiff that he was going to call defense counsel and accept the settlement offer. Thereafter, Mr. Mills called Mr. Clemmons back and left a message, and called Mr. McReynolds to confirm the settlement. As a result, counsel for Braun and GAB did not appear at the scheduled depositions of Lloyd's representatives on August 4, 2010. Docket Entry No. 116, at 29-32.

On cross-examination, Mr. Mills testified that, although, at the conclusion of settlement discussions on July 28, 2010,[2] the plaintiff had given him authority to accept the settlement offer if GAB "could come up with $50,000," he did not dispute that, later on July 28, 2010, the plaintiff left a message for Mr. Mills and emailed Mr. Mills that he did not want him to commit to a settlement, until he "read, approved and specifically sign[ed] it." Id. at 43-44; Docket Entry No. 79, § 6. Thus, Mr. Mills agreed, after receiving the plaintiff's message and email, he no longer had authority to accept any offers.

Mr. Mills further testified that he had several conversations with the plaintiff on July 29, 2010, during which time Mr. Mills reported to the plaintiff that GAB had agreed to pay $50,000.00, recommended that the plaintiff accept it, and advised the plaintiff that the offer would probably be withdrawn unless the plaintiff accepted it before the upcoming depositions. Docket Entry No. 116, at 46-50. Although the plaintiff attested that Mr. Mills threatened to "quit [his] case" if he did not accept the offer, Docket Entry No. 79, § 7, Mr. Mills testified that, since it appeared that the plaintiff

---

[2] It is not clear whether the settlement discussions occurred on July 27, 2010, or July 28, 2010. Mr. Mills testified that they occurred on Wednesday, July 28, 2010 ("the same day as the deposition, when he left town"), Docket Entry No. 116, at 42, but defense counsel attested that the settlement conversations occurred on July 27, 2010. See Docket Entry Nos. 70, 71, and 72, at § 3. The plaintiff's deposition began on July 27, 2010, and concluded on July 28, 2010, see Docket Entry No. 124-5, so the settlement conversations could have occurred at the conclusion of the portion of the deposition on July 27, 2010, or after the deposition was fully completed on July 28, 2010. In his affidavit, the plaintiff refers only to the "day" of his deposition. Docket Entry No. 79, § 4. It is, however, logical to assume that settlement discussions would have taken place on July 28, 2010, after the completion of the plaintiff's deposition.

was not "valu[ing]" his advice, the plaintiff needed to get another attorney whom he could trust. Id. at 45-49.

On July 30, 2010, Mr. Mills wrote to the plaintiff confirming the July 29, 2010, telephone conversations, and suggesting names of other lawyers who might represent him. Id. at 52-53; Docket Entry No. 79, § 9. On the same date, Jim Watry[3] picked up the plaintiff's file from Mr. Mills' office, at the plaintiff's behest. Docket Entry No. 116, at 53-54; Docket Entry No. 79, § 11. However, on July 30, 2010, the plaintiff asked Mr. Mills to find out if the offer were still available from Braun. Docket Entry No. 116, at 51; Docket Entry No. 79, § 12. It was not Mr. Mills' understanding that any agreement had to be in writing at that time because it "wasn't an issue" since Mr. Mills did not have any authority to accept "the deal" and Mr. Mills did not know whether the offer was still available. Docket Entry No. 116, at 51-52.

Mr. Mills testified that the material terms of the agreement between the plaintiff and Braun were that Braun would pay $25,000.00 to the plaintiff from its insurance carrier, that the plaintiff would agree to the sliding-scale to pay Braun based on the recovery from Lloyd's, and release of and dismissal of claims. Docket Entry No. 116, at 54, 60, 73. He also related that "there was a general agreement that Braun would cooperate with us in providing their damages," i.e., the work they did that the plaintiff sought to recover from Lloyd's, and that Mr. Clemmons had represented during the settlement discussions that Braun would cooperate with the plaintiff in helping prove damages. Id. at 54-55, 58-60. However, Mr. Mills clarified that, even though he probably would have put a paragraph in the final settlement agreement about cooperation, he did not consider Braun's cooperation to be a material term of the agreement since there was not anything the plaintiff needed from Braun and Mr. Mills intended to "subpoena them, anyway," although Mr. Mills anticipated that Braun would cooperate because it was in "their interest to do so." Id. at 56-57. Mr. Mills acknowledged that the plaintiff had expressed concerns about Braun's cooperation on August 2, 3,

---

[3] Mr. Watry described himself as currently a handyman, who works for his wife, the plaintiff's property manager. Docket Entry No. 124-3, at 40-42.

and 4, 2010, along with other concerns that "didn't make any sense" to Mr. Mills and that he addressed those concerns with the plaintiff "at length" on several occasions.

Specifically, Mr. Mills testified that whether expert witness fees would be deducted from any amount to be paid to Braun was not a material term because there were no expert witnesses, that the amount to be paid to Braun was based on the "total" amount recovered from Lloyd's, including attorney's fees, that confidentiality was not part of the settlement, that cooperation was not material because such a term was not necessary, and indemnification was not an issue in the case. Id. at 63-68, 74. He also related that there was no mention of confidentiality until counsel for GAB broached the subject on August 3, 2010, but it was never a material term of the settlement. Id. at 65-66, 80, 106-107.

Braun arranged for Mr. Easterwood, who was in charge of the project at issue and who had previously worked for Braun, to appear at his deposition without a subpoena, and he testified differently in his deposition on July 29, 2010, than he had attested in a previously filed affidavit. Docket Entry No. 116, at 97-98. Specifically, Mr. Easterwood denied that Mr. Espey, the adjustor for GAB, told him that the construction work was covered by insurance, as he had attested in his affidavit. Id. at 117-118. Mr. Mills testified that Mr. Easterwood's change in testimony had no impact on Braun's cooperation with the plaintiff because he had intended to subpoena Mr. Easterwood to trial and he believed that, with a settlement of the claims with Braun, the plaintiff would benefit by Mr. Easterwood's testifying at trial solely on the issue of damages without his testimony being affected by his inconsistent statements that related to the crossclaim between Braun and GAB. Therefore, according to Mr. Mills, it was not necessary to include a provision about Braun's cooperation in the settlement agreement inasmuch as Braun would not be able to guarantee that it could produce Mr. Easterwood at trial. Id. at 119-127.

Mr. Mills testified that the first time he was aware that the plaintiff was not in agreement with Mr. Mills' letter of August 2, 2010 (Defendants' Exhibit 1), was on August 3, 2010, when the plaintiff told him he wanted "everything to be in writing" so that he could "consider the proposals

8

and stew over them for a while." Docket Entry No. 116, at 76. Mr. Mills tried to explain to the plaintiff that his concerns were not valid, opined that the plaintiff had "gotten some really bad advice about how subpoenas worked and depositions worked," and explained to the plaintiff that there was an August 3, 2010, deadline to accept the settlement, and that, although Mr. Mills explained that he thought that he had "already done the deal," the plaintiff instructed Mr. Mills "to tell them that the deal is off." Id. at 77. On August 3, 2010, the plaintiff emailed Mr. Mills as follows:

> I always thought nothing is set in stone untill (sic) it is signed. I want you to convey this to the other parties before more time passes. I never wished to be committed to something vague. Again, I thought all the details would be ironed out prior to commitment. This was also mentioned the day of my deposition. You must notify the other parties of this as I am not in agreement with them at this time.

Plaintiff's Exhibit 1.

Mr. Mills described his confusion with the plaintiff's position and emailed the plaintiff on August 4, 201, asking him write out what he wanted so that Mr. Mills could send it to defendants' counsel, but the plaintiff never did. Docket Entry No. 116, at 77-78, 88; Plaintiff's Exhibit 2. After August 2, 2010, he also got messages from defendants' counsel about obtaining tax identification numbers and inquiring about the payee on the checks. Id. However, Mr. Mills did not respond to those messages and acknowledged that he had not advised defendants' counsel that the "deal was off" until his letter of August 12, 2010, enclosing a copy of his motion to withdraw (Defendants' Exhibit 3). Id. at 80-81, 87-88.

On redirect, Mr. Mills testified that, despite the plaintiff's description of the settlement as "vague," see Plaintiff's Exhibit 1, there was nothing vague in the agreement, and that, despite the plaintiff's attestation in his affidavit that he had "never seen" or "fully understood" the provision relating to the sliding scale, see Docket Entry No. 79, § 16, the written sliding scale proposal was provided to the plaintiff on July 28, 2010, and the plaintiff took it with him when he left. Docket Entry No. 116, at 93-95. In addition, Mr. Mills testified that the plaintiff did not express "any misunderstanding or confusion" about the terms of the sliding scale and he discussed the possible scenarios with the plaintiff. Id. at 95. Mr. Mills also explained that he had relayed to the plaintiff

9

that Mr. Godbold had provided that his offer would be "good" until noon on August 3, 2010, so there was insufficient time to engage in "vetting" a settlement document "back and forth." Id. at 101. Mr. Mills also testified that, after he wrote to the plaintiff on August 3, 2010, that he had specifically asked the plaintiff "on Monday [August 2, 2010] if [he] had authority to accept the offer, and you said yes [and] [n]ow you're taking another position," see Docket Entry No. 79, § 25, the plaintiff did not "refute that he gave me the authority verbally." Docket Entry No. 116, at 103.

On re-cross examination, Mr. Mills testified that the first notice he got from the plaintiff that he was not in agreement with the settlement was in the morning of August 3, 2010. Id. at 114. Despite such notice, Mr. Mills still appeared at the depositions on August 4, 2010, knowing that counsel for Braun and GAB did not appear because they assumed a settlement had been reached, and did not relay the plaintiff's change in position because, according to Mr. Mills:

> [the plaintiff] wasn't making any sense. He wanted the deal, but he wanted proposals on the deal. He wanted to go forward and get the money, but he wanted more things. I couldn't get from him what he wanted to do.
> He put me in a position where he wanted to keep the deal, but he didn't think he had a deal. So I was trying to get him to explain to me, "Exactly what is it you're trying to do?" He finally did that when he said, "I want out of the deal."

Id. at 114-115.

### III. Discussion

The District Court has the inherent authority to enforce settlement agreements entered into by the parties in pending cases. Bamerilease Capital Corp. v. Nearburg, 958 F.2d 150, 152 (6th Cir.), cert. denied, 506 U.S. 867, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992); Brock v. Scheuner Corp., 841 F.2d 151, 154 (6th Cir. 1988); Bostick Foundry Co. v. Lindberg, 797 F.2d 280, 282-83 (6th Cir. 1986), cert. denied sub nom Dakmak v. Lindberg, 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987). See also Kukla v. National Distillers Prods. Co., 483 F.2d 619, 621 (6th Cir. 1973). Enforcement of a settlement agreement is appropriate when no substantial dispute exists regarding the entry into and terms of an agreement. The power of a trial court to enforce a settlement agreement has its basis in the policy favoring the settlement of disputes and the avoidance of costly

10

and time-consuming litigation. Id. This authority extends to enforcing both oral and written settlement agreements. See Re/Max Int'l, Inc. v. Realty One, Inc., 271 F.3d 633, 646 (6th Cir. 2001), cert. denied, 535 U.S. 987, 122 S.Ct. 1539, 152 L.Ed.2d 466 (2002); Bowater N. Am. Corp. v. Murray Mach., Inc., 773 F.2d 71, 76-77 (6th Cir. 1985).

In Bowater, the Sixth Circuit expressly held that the district court "has the inherent authority and equitable power to enforce agreements in settlement of litigation before it, even if that agreement has not been reduced to writing." 773 F.2d at 76-77 (citations omitted). See also Moore v. United States Postal Serv., 369 Fed.Appx. 712, 717, 2010 WL 935620 (6th Cir. Mar. 17, 2010); Therma-Scan, Inc. v. Thermoscan, Inc., 217 F.3d 414, 419 (6th Cir. 2000); Brock, 841 F.2d at 154. Again, as the Sixth Circuit pointed out in the oft-cited case of Re/Max,

> [t]he existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When the parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement.

271 F.3d at 646.


A. Apparent Authority

Defendants Braun and GAB argue that Mr. Mills had the apparent authority to enter into a binding settlement agreement, citing Capital Dredge & Dock Corp. v. City of Detroit, 800 F.2d 525 (6th Cir. 1986). In Capital Dredge, the Court noted that the rule of apparent authority in the context of agency law is "[i]f a third party, based on a principal's manifestations, reasonably believes that the supposed agent is authorized to enter into a transaction or agreement," the principal will be bound to that agreement even if the agent had no actual authority to act for the principal, and that "[a]pparent authority is created by the principal's manifestations to the third party . . . ." 800 F.2d at 530. In the context of an attorney as an agent for his client, the Court found that, when "a client hires an attorney and holds him out as counsel representing him in a matter, the client clothes the attorney with apparent authority to settle claims connected with the matter." Id. at 530. While

11

assuming that Michigan courts had not specifically addressed apparent authority in the attorney-client context, the Court believed that the Michigan courts would adopt the general rule in that context. Id. at 531. Therefore, the Court found that the plaintiff had released certain claims because, since it had hired counsel to represent it on the matters, it held counsel out as having authority and the defendant could have reasonably believed that plaintiff's counsel had authority to release the claims.

However, the Court in Capital Dredge applied what it believed the Michigan courts would find the law to be.[4] Since the validity of a settlement agreement is determined by reference to the substantive law of the state in which the settlement was entered, see Bamerilease, 958 F.2d at 152, it is Tennessee law--not Michigan law--to which the Court must look. In Harris v. City of Chattanooga, 137 Fed.Appx. 788, 2005 WL 1400199 (June 15, 2005), cert. denied, 547 U.S. 1019, 126 S.Ct. 1572, 164 L.Ed.2d 299 (2006), the Sixth Circuit distinguished the holding in Capital Dredge, applying Michigan law, from Tennessee law, which generally holds that "an attorney cannot surrender substantial rights of a client, including agreeing to dismissal of litigation . . . without the express authority of the client," citing Absar v. Jones, 833 S.W.2d 86, 89-90 (Tenn.Ct.App. 1992). Harris, 2005 WL 1400199, at *4. The Court also relied on the Tennessee cases of Austin Powder Co. v. Thompson, 1995 WL 33778 (Tenn.Ct.App. Jan. 27, 1995), and Fort Sanders Reg'l Med. Ctr. v. Collins, 1992 WL 184682 (Tenn.Ct.App. Aug. 5, 1992). In Fort Sanders, the Tennessee Court of Appeals articulated the "universal rule that a client's employment of an attorney does not clothe

---

[4] In McKelvie v. City of Mt. Clemens, 1991 WL 139697 (6th Cir. July 30, 1991), the Court appeared to backtrack on its prior ruling in Capital Dredge, citing other Michigan cases that were not addressed in Capital Dredge. See also Capital Dredge, 800 F.2d at 534 (Wellford, J., dissenting). In Rheault v. Lufthansa German Airlines, 899 F.Supp. 325 (E.D. Mich. 1995), the Court interpreted Capital Dredge as holding that simply retaining an attorney for purposes of the lawsuit does not give the attorney the apparent authority to settle the case since the client must have manifested to the third-party "reason to believe" that the attorney had the authority to settle (not simply represent the client). 899 F. Supp. at 329. But see Noga v. Parts Assocs., Inc., 205 F.3d 1341, 2000 WL 178385 (6th Cir. Feb. 8, 2000) (per curiam) (Court relied on Capital Dredge without citing Ohio law).

the attorney with authority to compromise and settle her client's cause of action, and such authority may not be implied." 1992 WL 184682, at *1. See also Austin Powder, 1995 WL 33778, at *2.

It is not disputed that defendants' counsel believed that Mr. Mills had the apparent authority to enter into a settlement on behalf of the plaintiff. It is also clear that there were manifestations by the plaintiff to counsel for Braun and GAB that Mr. Mills was representing the plaintiff in settlement negotiations, especially in light of the fact that the plaintiff, Mr. Mills, and counsel Braun and GAB met together on July 27, 2010, or July 28, 2010, to address settlement proposals. However, whether such manifestations are sufficient to support enforcement of the settlement relayed by Mr. Mills is less clear under Tennessee law.

B. Actual Authority

Whether or not a settlement agreement can be enforced in Tennessee based on an attorney's apparent authority need not be answered definitively, since the Court finds that Mr. Mills had actual authority to relay an acceptance of the settlement to counsel for Braun and GAB. While it is clear that Mr. Mills did not have the authority to settle the case prior to August 2, 2010, he testified that on August 2, 2010, the plaintiff clearly gave Mr. Mills authority to accept "the deal." The plaintiff did not rebut Mr. Mills' testimony to that effect.

That acceptance of the "deal" prompted Mr. Mills to immediately communicate with defense counsel that the plaintiff had accepted the settlement offer. The Court acknowledges that, shortly after the August 2, 2010 conversation, the plaintiff began having second thoughts and focusing on his desire to have a written agreement to peruse before relaying his final assent to an agreement. However, having second thoughts for whatever reason and within whatever time frame does not negate the fact that the plaintiff told his attorney that he accepted "the deal." Once he expressed those words, the dye was cast. The plaintiff appears to have been under an impression that a settlement cannot be effected unless it is in writing. See Plaintiff's Exhibit 1. Any such impression

13

of the law is simply incorrect. See Moore, 369 Fed.Appx. at 717; Re/Max, 271 F.3d at 646; Therma-Scan, 217 F.3d at 419; Brock, 841 F.2d at 154; Bowater, 773 F.2d at 76-77.

C.  Statute of Frauds

In the plaintiff's pre-hearing response (Docket Entry No. 80), he contends that the "lack of material terms" in the August 2, 2010, letter "renders the proposed terms unenforceable or a violation of the Tennessee Statute of frauds" since agreements involving sums of money and affecting real property must be in writing, citing the lien that Braun has placed against the property. Id. at 4.  Plaintiff's counsel maintained the same argument at the hearing, analogizing a settlement to a real estate closing.  Docket Entry No. 116, at 9-10.  However, the plaintiff cited no cases in support for the proposition that, if there is a lien on the property at issue, the parties cannot enter into an enforceable verbal settlement.  Despite the plaintiff's having raised this issue, the real thrust of the plaintiff's argument is that the parties did not agree upon all essential or material terms of the settlement.

D.  Essential Terms of the Settlement

The fact that the plaintiff accepted "the deal" does not provide grounds to enforce the settlement unless the parties agreed to the essential terms of the settlement.  See Re/Max, 271 F.3d at 646.  The "deal" to which the plaintiff agreed was that GAB would pay the plaintiff $50,000.00, that Braun would pay the plaintiff $25,000.00, that the plaintiff would pay Braun a portion of his recovery against Lloyd's based on a sliding scale outlined in Defendants' Exhibit 2, and that the plaintiff would release his claims against GAB and Braun and Braun would release its claims against the plaintiff.  The plaintiff argues that there were numerous other terms of the settlement upon which no agreement was reached.

14

### 1. Confidentiality and Breach of Confidentiality

Plaintiff's counsel represented that the plaintiff would never agree to confidentiality. Docket Entry No. 116, at 143. However, there was no provision for confidentiality in the settlement agreement. Although Mr. Mills testified that Mr. Godbold mentioned confidentiality on August 3, 2010, there is no evidence that it was an essential term for any party in the case. Further, there was absolutely no proof that any party had raised the subject of any penalty for breach of any confidentiality provision.

### 2. Braun's Cooperation

Although there was discussion on July 28, 2010, about Braun's further cooperation, the Court cannot find that it was an essential term. It appears that Mr. Mills' assumption that Braun will cooperate is legitimately based on the fact that it is in Braun's self-interest to do so inasmuch as, under the terms of the settlement, the more that the plaintiff recovers from Lloyd's, the more the plaintiff is obligated to pay Braun. However, as Mr. Mills testified, Braun has already produced discovery that the plaintiff needs and there is nothing left for Braun to provide to the plaintiff. Considerable attention was given at the hearing to the fact that Mr. Easterwood testified at this deposition in apparent contradiction to a prior sworn affidavit (Docket Entry No. 36), from which the plaintiff infers Mr. Easterwood might not be willing to voluntarily appear at trial to face examination about that inconsistency. In his supplemental response (Docket Entry No. 92) filed after the hearing, the plaintiff details the contradictions between Mr. Easterwood's affidavit and his deposition testimony, maintaining that "[t]his dramatic turnaround in testimony casts doubt on any good faith cooperation from Braun . . . which [the plaintiff] understood to be part of any deal with any Defendant." Docket Entry No. 92, at 7.

The Court finds that the plaintiff's argument that Mr. Easterwood's change of testimony "casts doubt" on Braun's cooperation is without basis. First, even if Braun agreed to cooperate with the plaintiff, it cannot guarantee that it would be able to procure Mr. Easterwood's attendance at trial

since he is no longer Braun's employee. Second, Mr. Mills testified that he fully intended to subpoena Mr. Easterwood to trial even if Braun agreed to procure his attendance without a subpoena. There is no evidence that Mr. Easterwood would attempt to avoid a subpoena. Third, the plaintiff would call Mr. Easterwood to testify on the work performed by Braun, which is part of the plaintiff's claim against Lloyd's. The issue of Mr. Easterwood's inconsistent testimony does not relate to the work performed by Braun; it relates to the crossclaim against GAB, which was dismissed. To the extent that an essential term of the settlement to the plaintiff was the "availability of witnesses under the defendant's control," see Docket Entry No. 80, at 4, there was absolutely no evidence about that issue, other than related to Mr. Easterwood, or what it means.

### 3. Disclosure of Other Agreements

Other than brief questioning about the admissibility of the settlement agreement, see Docket Entry No. 116, at 129, there was no evidence about other agreements or to what the plaintiff may have been referring in his response. See Docket Entry No. 80, at 4.

### 4. Sliding Scale

The plaintiff contends that he did not understand the sliding scale that would determine what he would pay Braun, depending upon his recovery from Lloyd's, and that it was "vague." The terms of the sliding scale are as follows:

> If Plaintiff receives $372,000.00 or more from any source/s in this action, then he will pay Braun $110,000.00. If Plaintiff receives less than $372,000.00 and $100,000.00 or more from any source/s in this action, then he will pay Braun 30% of that amount, but not less than $60,000.00. If Plaintiff receives less than $100,000.00 from any source/s in this action, then he will pay Braun 25% of that amount.
>
> $372,000 or more = $110k
>
> $371,999.99 to $100,000 = 30%, but not less than $60k
>
> $99,999.99 or less = 25%

Defendants' Exhibit 2.

(a) Deductions from payment to Braun

Essentially, the plaintiff questions whether the agreement called for payment to Braun based on the "gross" or "net" recovery from Lloyd's. Although plaintiff's counsel inquired of Mr. Mills at the hearing whether expert fees would be deducted from any payment the plaintiff would make to Braun out of the recovery from Lloyd's, Mr. Mills testified that there were no expert fees incurred in this case. Therefore, expert fees are not an issue. When questioned about whether attorney's fees would be deducted, Mr. Mills referred to the language of the agreement. Although the plaintiff is correct that the agreement does not address recovery for attorney's fees, Mr. Mills essentially testified that, by the terms of the agreement, any amounts recovered from Lloyd's would be subject to the sliding scale to determine payment to Braun and that the amount to be paid to Braun was based on the "total" amount recovered from Lloyd's, including attorney's fees.

(b) Reference to "any source/s"

The plaintiff questions what "any source/s" means and if it includes the settlement payment from GAB or the payment from Braun. To suggest that the plaintiff would be required to pay Braun 25% of the $25,000.00 Braun paid the plaintiff borders on being ludicrous. The plaintiff would have a legitimate concern about whether he is required to pay Braun 25% of the $50,000.00 he receives from GAB but for the fact that Mr. Mills' August 2, 2010, letter to counsel for Braun and GAB made it clear that the "sliding scale" was based on the amount the plaintiff recovered from Lloyd's. Defendants' Exhibit 1. Although Mr. Clemmons attached the sliding scale agreement to his letter of August 3, 2010, after receipt of Mr. Mills' August 2, 2010, letter, Mr. Clemmons simply attached the same "sliding scale" document that had been presented at the earlier settlement discussions. While the Court acknowledges that the "any source/s" language was inartful, there was no evidence that defendants' counsel ever questioned the terms that Mr. Mills set out in the August 2, 2010, letter.

### 5. Braun's Lien

The plaintiff correctly points out that the settlement did not address Braun's materialman's lien placed on the property.

In his opening statement at the hearing, counsel for Braun indicated that the terms of the settlement included Braun's releasing the lien. However, Mr. Mills testified that the lien would stay in place since it might discourage the plaintiff's bank from instituting foreclosure proceedings. Although it may be to plaintiff's benefit for the lien to remain in place, the evidence presented to the Court indicated that the plaintiff would release his claims against Braun and GAB and Braun would release its claim against the plaintiff. Such a release would necessarily include release of the lien.

### 6. Whether the agreement applies to Braun as a defendant and counter-plaintiff

There is no question that the settlement addresses the plaintiff's claims against Braun and Braun's counterclaim against the plaintiff. Braun is represented by different attorneys on the plaintiff's claims and its counterclaim. The evidence showed that both attorneys for Braun agreed to the settlement.

### 7. Indemnification

Although the plaintiff did not otherwise raise an issue about indemnification, plaintiff's counsel asked Mr. Mills about the issue, and Mr. Mills testified that there was no reason to include such a term in the settlement, and the plaintiff has not suggested otherwise.

Therefore, the Court finds that the plaintiff, GAB, and Braun (in both its capacity as a defendant and counter-plaintiff) agreed to the essential terms of the settlement as memorialized in Mr. Mills' August 2, 2010, letter and the attachment to Mr. Clemmons August 3, 2010, letter, and that the settlement agreement should be enforced.

## IV.  RECOMMENDATION

For the reasons addressed above, it is recommended that the settlement agreement entered into between the plaintiff, Braun, and GAB on August 2, 2010, be enforced.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of receipt of this notice, and must state with particularity the specific portions of this Report & Recommendation to which objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge