IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ALEX SCHAUFFERT,<br>     Plaintiff/Counter-Defendant | )<br>)<br>) |
| v. | )     No. 3-09-0510<br>) |
| CERTAIN UNDERWRITERS AT<br>LLOYD'S, LONDON; GAB ROBINS<br>NORTH AMERICA, INC.,<br>     Defendants | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| BRAUN CONSTRUCTION SERVICES,<br>INC.,<br>     Defendant/Counter-Plaintiff | )<br>)<br>) |

TO:    The Honorable Todd J. Campbell, Chief Judge

## REPORT AND RECOMMENDATION

By order entered October 1, 2010 (Docket Entry No. 91), the motion of defendant

Certain Underwriters at Lloyd's, London ("Lloyd's") for summary judgment (Docket Entry

No. 87) was referred to the Magistrate Judge for a report and recommendation.

## I. Background

The plaintiff purchased the "Shannondale Apartments" in Madison, Tennessee in

2006. There are two apartment buildings, one with eight units (Building A) and the other

with six units Building B). Early in the morning on January 27, 2009, Building A sustained

damages after the roof failed during a storm. According to the plaintiff, the roof collapsed

because of collected rain and ice and the water intrusion caused extensive damage. Docket

Entry No. 21, at 3. The building was insured by defendant Lloyd's, which denied coverage

under the policy.

The plaintiff originally brought this action in state court against Lloyd's, his insurance carrier, GAB Robins North America, Inc. ("GAB"), the local adjuster, and Braun Construction Services ("Braun"), which had done emergency repairs to the building, seeking damages for the cost of repair and rebuilding of the roof. The defendants removed the case to this Court. Braun filed a counterclaim against the plaintiff for enforcement of its materialman's lien and damages for breach of contract and unjust enrichment (Docket Entry No. 11). Braun also filed crossclaims against Lloyd's and GAB for negligent misrepresentation, breach of implied contract, and promissory estoppel. Id. By order entered December 23, 2009 (Docket Entry No. 48), the motions of defendants Lloyd's and GAB to dismiss Braun's crossclaims were granted on Braun's claims for breach of contract and promissory estoppel, but denied on Braun's claims for negligent misrepresentation. Upon Braun's motion, the remaining crossclaims filed by Braun against Lloyd's and GAB were dismissed by order entered May 10, 2010 (Docket Entry No. 58).

Defendant Lloyd's filed the instant motion for summary judgment, contending that the loss suffered by the plaintiff is not covered under the insurance policy.

## II.  Amick DVD and Affidavit

The defendant has filed a motion (Docket Entry No. 121) to exclude DVD and affidavit of Kenneth Amick (Docket Entry No. 95) from any consideration in the context of the defendant's motion for summary judgment or any trial.

The defendant points out that the discovery deadline was August 27, 2010, and the DVD was produced as a "partial supplement" to plaintiff's disclosures, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, on August 26, 2010. See Docket Entry No. 122-1. The affidavit of Mr. Amick was filed on October 19, 2010, and the DVD was filed on October 22, 2010, in accord with the order entered October 21, 2010 (Docket Entry No. 117).

Mr. Amick was a tenant in one of the units in Building A. He was at home when the roof failed on August 27, 2009, and attested in his affidavit to his observations.

The plaintiff listed Mr. Amick and other tenants by name in his initial Rule 26(a)(1) disclosures, and specifically identified Mr. Amick and other tenants by name in response to the defendant's interrogatories. See Docket Entry No. 122-2, at 2-3 and 122-6, at 3. The defendant points out that Mr. Amick has been "accessible to Plaintiff and/or his agents through this litigation." Docket Entry No. 122, at 6. Correlatively, however, there is nothing to suggest that Mr. Amick has not been just as available to the defendant throughout the litigation. Securing the affidavit of a witness, identified in the plaintiff's initial disclosures and in the plaintiff's responses to written discovery, who was not deposed by either the plaintiff or the defendant, is not discovery, and there are no grounds to exclude his affidavit since he was previously disclosed by the plaintiff.

The defendant suggests that it "could also be argued" that the plaintiff is attempting to "supply additional expert-type proof" because Mr. Amick was employed by a company doing commercial framing and sheetrock work, and he comments on the condition of the sheetrock in his affidavit. Id. at 7. His observations of sheetrock do not, however, qualify as expert opinions. The only remotely possible expert observation might be that he attested that he could see "where the plywood failed and was buckled in and down." Docket Entry No. 95, at 3, ¶ 15. The Court has not considered that portion of his affidavit.

The Court has not viewed the DVD or considered it in the context of the motion for summary judgment.

Whether Mr. Amick's affidavit, DVD, or his testimony can be used by the plaintiff at trial is not an issue for the Magistrate Judge in the context of considering the defendant's motion for summary judgment, and the Court's consideration of his affidavit and declination to access the DVD are not intended to suggest or prejudge whether they would be admissible at trial.

### III.  Hodge Affidavit

By his motion (Docket Entry No. 98), the plaintiff seeks to strike all or portions of the affidavit of Matthew W. Hodge (Docket Entry No. 87-6).  On March 5, 2010, defendant Lloyd's disclosed Mr. Hodge as its expert and provided a written report dated February 20, 2009.  See Docket Entry No. 120-3.  On January 15, 2010, the plaintiff had also identified Mr. Hodge as his expert and disclosed the same expert report.  See Docket Entry No. 120-2. In support of its motion for summary judgment, defendant Lloyd's filed Mr. Hodge's affidavit, which the plaintiff describes as "vastly and improperly expand[ing] his opinions." Docket Entry No. 98, at 2.  The plaintiff also points out that the defendant has not supplemented its disclosures in accord with Rule 26(e)(2) of the Federal Rules of Civil Procedure to include his additional opinions in his affidavit.[1]

The plaintiff also appears to seek disqualification of Mr. Hodge as an expert because, inter alia, he did not include in his disclosure his experience with commercial roofing, did not include a curriculum vitae,[2] did not sign his report, and because his February 4, 2009, and February 9, 2009, draft reports are inconsistent with the February 20, 2009, report.  The issue of whether the defendant should be permitted to use Mr. Hodge as an expert at trial is before the Court in the context of a motion in limine (Docket Entry No. 130).

Mr. Hodge's affidavit clearly provides additional detail lacking in his February 20, 2009, report.  However, Mr. Hodge is not bound to the four corners of his expert disclosure as he would have been if the Court had invoked Local Rule 37.01(c)(6)(c).  Had Mr. Hodge been deposed, he would have been permitted to add detail and flesh out his opinions in his February 20, 2009, report.  Further, Rule 26(e)(2) of the Federal Rules of Civil Procedure

---

[1]  The plaintiff cites Pedigo v. UNUM Life Ins. Co. of Am., 145 F.3d 804 (6th Cir. 1998), as support for his position that Mr. Hodge's affidavit should be excluded.  However, Pedigo is inapposite because the plaintiff himself in that case sought to offer his own expert testimony when he had never disclosed himself as an expert.

[2]  The defendant has since provided a CV.  See Docket Entry Nos. 127-2 and 127-3.

provides that a party has a duty to supplement information included in an expert's report, and that such supplementation must be made by the time the Rule 26(a)(3) disclosures are due. The initial case management order entered July 21, 2009 (Docket Entry No. 21) did not provide a date by which any expert disclosures were to be supplemented. By order entered December 6, 2010 (Docket Entry No. 139), Rule 26(a)(3) filings must be made by June 20, 2011.

While there may be an issue of whether or not Mr. Hodge's affidavit is appropriately considered a supplementation of his February 20, 2009, report, see Sandata Techs., Inc. v. Infocrossing, Inc., 2007 WL 4157163, **4-6 (S.D.N.Y. Nov. 16, 2007), Mr. Hodge did not contradict his prior expert report but, as the plaintiff notes "expanded" on his opinions. Docket Entry No. 98, at 2. Thus, as the Court of Appeals has indicated in Yanovich v. Zimmer Austin, Inc., 255 Fed.Appx. 957, 953, 2007 WL 4163860, *6 (6th Cir. Nov. 21, 2007), it is permissible to consider his affidavit for the purposes of ruling on the motion for summary judgment.[3]

## IV. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See Pennington v. State Farm Mut. Auto. Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009); Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979). In considering a motion for summary judgment,

---

[3] The Court in Yanovich did not, as the defendant suggests, find that the expert's opinions were "neither new or contradictory and any differences are explained as semantical." Docket Entry No. 120, at 7. Instead, the Court quoted the plaintiffs' brief in which they made that statement. The Court found that the apparent contradictions between the expert's deposition testimony and his affidavit filed in opposition to the defendant's motion for summary judgment were not contradictions of his scientific findings, but only clarifications of his legal interpretation of those findings, and thus the trial Court should not have excluded his affidavit from its consideration in ruling on the defendant's motion for summary judgment.

the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Pennington, 553 F.3d at 450; Van Gorder v. Grand Truck W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 466 (6th Cir. 2003); Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002); Securities & Exch. Comm'n v. Blavin, 760 F.2d 706, 710 (6th Cir. 1985). Although the moving party has the burden of showing that no genuine issue of material fact exists, the non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with specific evidence supporting its claim and establishing the existence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Hopson, 306 F.3d at 432; Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989). A mere scintilla of evidence is insufficient; there must be evidence upon which the jury could reasonably find for the non-movant. Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003); Meyers, 341 F.3d at 466.

Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. Anderson, 477 U.S. at 248. The dispute must also be genuine. The facts must be such that, if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. Id. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial. First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

## V. Motion for Summary Judgment

Defendant Lloyd's contends that the loss suffered was not a covered loss under the insurance policy because the water damage was caused by ponding water from flooding or ponding surface water, because the plaintiff cannot prevail on a claim for damages as a result of rainwater intrusion since the building must have first suffered damage from a covered loss such as wind, because the damage incurred is excluded under the policy since the roof failure resulted from wear and tear and other deterioration, and because the roof did not collapse as defined by the policy. The defendant further contends that the plaintiff's claim under the Tennessee Consumer Protection Act ("TCPA") fails because Cathy Watry, the plaintiff's agent and building manager, was advised that the policy might not provide coverage and because the denial of coverage under the circumstances of this case does not support a TCPA claim.

The plaintiff filed a response in opposition (Docket Entry No. 115), and other related filings (Docket Entry Nos. 95, 97, 100-104, 106-107, 109-110, 112),[4] and defendant Lloyd's filed a reply (Docket Entry No. 119), and other related filings (Docket Entry Nos. 123-124, 128).

The plaintiff's responsive filings, particularly Docket Entry Nos. 97, 101-104, 106-107, and 109, are confusing. Each of those filings is identically entitled "Plaintiff's Separate Statement of Material Facts in Support of Plaintiff's Response to Defendant Lloyd's Motion for Summary Judgment." The same "fact" is listed on each of those filings, i.e., "The roof of Plaintiff's insured building collapsed within the meaning of the Policy and is a covered loss."

---

[4] Although the plaintiff described Docket Entry No. 108 on the docket as part of his response to the pending motion for summary judgment, it appears to the Court that it was filed, as the document itself indicates, after the evidentiary hearing on September 22, 2010, and in response to the motion to show cause why the settlement agreement between the plaintiff and defendants GAB and Braun should be enforced (Docket Entry No. 68), and was not intended as a filing related to the pending motion for summary judgment.

The difference among most of these filings is the attachments to the filings. The first filing (Docket Entry No. 97) has nothing attached to it. Appended to the next filing (Docket Entry No. 101) are portions of the depositions of Brad Espey (Docket Entry No. 101-1) and Mark Easterwood (Docket Entry No. 101-2). However, the identical excerpt of Mr. Easterwood's deposition is also appended to Docket Entry No. 109. The next filing (Docket Entry No. 102), is an exact duplicate of Docket Entry No. 97, with nothing attached. Attached to Docket Entry No. 103 are portions of the deposition of Ransom Brent. Docket Entry No. 104 is an exact duplicate of Docket Entry No. 103.[5] Attached to Docket Entry Nos. 106 and 107 are different portions of Cathy Watry's depositions.[6]

More significantly, the plaintiff's response (Docket Entry No. 100) to the defendant's statement of undisputed material facts (Docket Entry No. 87-4) does not comply with Local Rule 56.01(c), which provides that the response to a statement of undisputed facts "must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant." The plaintiff did not comply with that requirement. In addition, perhaps analogizing his obligation to respond to the defendant's Rule 56.01(b) statement to responding to interrogatories or requests for admission, the plaintiff repeatedly lodged objections to the facts asserted by Lloyd's. An objection is not a permissible response. In accord with

---

[5] The plaintiff incorrectly entered the description of Docket Entry No. 103 on the docket as including Exhibit D as an attachment. In his filings, the plaintiff describes Exhibit D as the plaintiff's deposition, which was not attached to Docket Entry No. 103, whereas the plaintiff describes Exhibit E as Mr. Brent's deposition, portions of which are attached. It may be that the plaintiff intended to attach excerpts of the plaintiff's deposition, described as Exhibit D, to Docket Entry No. 103, and to attach excerpts of the Brent deposition (described as Exhibit E), to Docket Entry No. 104, but instead, the Brent deposition excerpts are attached to both Docket Entry Nos. 103 and 104.

[6] In responding to the plaintiff's motion to strike Mr. Hodge's affidavit, the defendant also used the same confusing mechanism of filing the exact same document twice as a means to attach additional exhibits. See Docket Entry Nos. 120 and 127. Compounding the confusion, the defendant apparently scanned in the first filing, making it difficult to determine the docket number of the second filing.

Rule 56.01(c), the plaintiff had three choices in responding to the defendant's assertions of undisputed material facts: (1) agree that the fact is undisputed; (2) agree that the fact is undisputed for the purpose of the motion for summary judgment only; or (3) demonstrate that the fact is disputed with specific citation to the record to support the contention that the fact is disputed.[7]

In essence, the plaintiff argues in his response that the damage to the property resulted from the collapse of the roof and ceiling and that such damage is covered by the insurance policy, that the decay of the roof was hidden from view and therefore the loss is not excluded, that the building had been regularly maintained and repaired as needed and that there were no leaks since April of 2008, and only a few leaks prior thereto, and that the weight of the rain caused the collapse. The plaintiff maintains that Brad Espey, the local adjuster for GAB, who investigated the damage to the building on behalf of Lloyd's, advised Cathy Watry, the plaintiff's property manager, and Mark Easterwood, the construction supervisor for Braun, that the plaintiff had insurance coverage for the loss and, in reliance on those representations, the plaintiff allowed Braun to begin emergency repair work. According to the plaintiff, the defendant's shoddy investigation of the claim, and assurances of coverage and later denial of coverage, coupled with Lloyd's demand that Mr. Espey lie and his perjured deposition testimony, support a TCPA claim.

## VI. The Policy

The insurance policy at issue provides the following relevant exclusions, limitations and definitions:

B.      Exclusions

1.      We will not pay for loss or damage caused directly or indirectly by any of the following.

---

[7] It is also not clear whether the plaintiff intended to cite an additional <u>disputed</u> material fact, as contemplated by Local Rule 56.01.

Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

\*\*\*

g. Water

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;
(b) Basements, whether paved or not; or
(c) Doors, windows or other openings.

2. We will not pay for loss or damage caused by or resulting from any of the following:

\*\*\*

d. (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

\*\*\*

(4) Settling, cracking, shrinking or expansion;

\*\*\*

But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" . . . we will pay

> > for the loss or damage caused by that "specified cause of loss" . . . .
>
> > ***
>
> > k.  Collapse, except as provided below in the Additional Coverage for Collapse. But if the collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

Docket Entry No. 87-5, at 31-33.

A "specified cause of loss" is defined as:

> Fire; lightning; explosion; windstorm or hail; smoke, aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice of sleet; water damage.

> > ***

"Water damage" is defined as:

> accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

Docket Entry No. 87-5, at 37.

"Collapse" is described and limited as follows:

> 1.  With respect to buildings:
>
> > a.  Collapse means an abrupt falling down or caving in of a building or any part of building with the result that the building or part of the building cannot be occupied for its intended purpose;
>
> > ***
>
> 2.  We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building . . . if the collapse is caused by one or more of the following:
>
> > ***
>
> > b.  Decay that is hidden from view, unless the presence of such decay is known to any insured prior to collapse;

***

    e.   Weight of rain that collects on a roof . . . .

Docket Entry No. 87-5, at 36.

   C.   Limitations

    The following limitations apply . . . unless otherwise stated.

    1.   We will not pay for loss of or damages to the property, as described and limited [below] . . . .

***

    c.   The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

     (1)  The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters, or

     (2)  The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

Docket Entry No. 87-5, at 34-35.

## A. Collapse

   Lloyd's argues that there is no proof of an "abrupt falling down or caving in" as defined under the policy. Lloyd's cites to the plaintiff's deposition, in which he testified that he did not know whether there was a collapse because he never saw the damage, to the deposition of the plaintiff's property manager, Cathy Watry, who testified that she did not see any collapse, and the plaintiff's maintenance man, James Watry, who admitted that there was no collapse.

   Ms. Watry testified that she arrived at the building after the storm and she did not see an "abrupt falling in" of any part of the roof or the building but she explained that the

12

"roof had to have collapsed for that much water to be coming through the ceiling." Docket Entry No. 123-1, at 167-68. Mr. Watry testified that he did not notice any holes or see where the roof had collapsed. Docket Entry No. 124-3, at 86-87. The plaintiff did not view the building until after Braun had performed repairs and had no first hand knowledge of what happened. The Court cannot find that the deposition testimony of Ms. Watry, Mr. Watry, and the plaintiff serve as admissions that the roof did not collapse.

Lloyd's maintains that, even if there were a collapse, the collapse would have had to have made the building uninhabitable and there is no coverage, since the building was not habitable "due to the history of leaks and other code violations," citing the deposition of Mattie Jones, a Metro property inspector. Docket Entry No. 87-1, at 14; Docket Entry No. 87-11, at 59. The defendant appears to be arguing that any collapse did not make the building uninhabitable because it was already uninhabitable. Ms. Jones testified that the water damage to the building caused her to ask all the tenants to leave and to "post the building as uninhabitable." Docket Entry No. 124-11, at 63. Although she testified that she believed that the building had received at least 11 code violations prior to January 27, 2009,[8] she did not testify that the building was uninhabitable "due to the history of leaks and other code violations" prior to January 27, 2009. See Docket Entry No. 124-11, at 63, 86-87.

In response, the plaintiff contends that the evidence of a "collapse" is "overwhelming." Docket Entry No. 115, at 3. He cites the deposition testimony of Ms. Jones who described the ceiling in one of the apartments as having "collapsed in." Id. at 54. Specifically, she related that not only had the ceiling collapsed, the actual sheetrock had also "collapsed down," that roof sheathing had collapsed, and that decking "had been rotted out" and "was gone." Id. at 67-68.

---

[8] She also testified that the violations related to inoperable vehicles, "junk trash and debris," and a sign. Docket Entry No. 124-11, at 23.

The plaintiff also cites to the deposition of Mr. Brent, a former tenant, who had mopped the roof with asphalt liquid twice before the plaintiff purchased the property and one time thereafter in April of 2008, and who performed other handyman tasks at the apartment complex under Mr. or Ms. Watry's direction. Docket Entry No. 124-13, at 14-16, 32, and 36. Mr. Brent testified that he had been on the roof on two occasions since the plaintiff purchased the property, specifically, in April of 2008, and on another occasion to retrieve a ball. He reported that he had seen "minute cracks" in the roof that did not look as if they would allow water to go through them and he did not notice any holes in the roof. Docket Entry Nos. 124-13, at 38-39, and 124-14.

In addition, the plaintiff relies on the affidavit of Kenneth Amick, a tenant, who attested that on January 26, 2009, there were no observable "drips, leaks, water stains or any other problems with the ceiling or walls" of his apartment until about 3:30 a.m. on January 27, 2009, when he heard a "loud and sudden crashing sound" followed by water gushing into his apartment, and that he saw a "large piece of sheetrock" and other material on the living room floor with water "streaming from the ceiling directly above the ceiling" and sheetrock and insulation hanging down from the ceiling around a large hole in the ceiling from which water "continued to rush in" like a "waterfall that would not stop" as opposed to a leak. He described the occurrence as "[t]he ceiling and roof collapse." Mr. Amick also attested that the "area of the collapse" was not the same area where there had previously been "a small leak," and that, to the best of his recollection there had been no other leaks in 2008 or 2009. According to Mr. Amick, he looked into the apartment next to his and saw that "it was actually raining inside this other apartment." Docket Entry No. 95, at 3-4, ¶¶ 11-16, and 22-23.

The defendant describes Mr. Amick's affidavit as "self-serving" and "simply not believable." Docket Entry No. 119, at 2. The defendant does not explain why the affidavit is "self-serving" or what interest Mr. Amick might have in making the attestations in his

affidavit.  The defendant maintains that it is not credible that Mr. Amick, who saw the "entire alleged 'collapse'" is the same witness who sustained the "one leak in the whole building that was plugged up until the alleged 'collapse.'"  Id.  There is nothing so incredible about Mr. Amick's affidavit that would warrant declining to consider it in the context of the issue of whether there had been a  collapse of the roof.

Finally, the plaintiff cites to Mr. Hodge's February 4, 2009, and February 20, 2009, reports, arguing that his first report of February 4, 2009, "largely supports a covered 'Collapse' as does his second Report of February 20, 2009."  Docket Entry No. 115, at 3.  However, the plaintiff decries Mr. Hodge's affidavit (Docket Entry No. 87-6) submitted by the defendant in support of its motion for summary judgment as indicative of the defendant's "clear manipulation."  Id.

Based on the record before the Court, the Court finds that there is a disputed issue of material fact on whether there was a collapse of the roof under the terms of the policy.


B.  Hidden Decay

The defendant argues that the record is "rife with testimony from roofing experts, the Plaintiff and his agents that the roof was in abysmal condition, leaking continuously, had a ponding problem, had been repaired poorly and improperly prior to the failure, and needed immediate replacement."  Docket Entry No. 87-1, at 14.  Lloyd's cites to the plaintiff's deposition testimony and the deposition testimony of Cathy Watry, Jim Watry, and Mattie Jones, and the affidavit of Matthew Hodge, the defendant's engineering expert, also designated as the plaintiff's non-retained expert, who observed soft roofing cement, indicating "very recent repairs or repairs over a wet surface," and opined that roofing repair cement should not be applied to a wet surface since it will not dry properly and will not

be able to withstand pressure from ponding water." <u>See</u> Docket Entry No. 87-6, at 4, ¶ 15.[9]
In addition, the defendant points out that, when the plaintiff purchased the building in
December of 2005, he was advised that there were tears in the roofing material and several
roof leaks in the second story units. Docket Entry No. 87-1, at 15. Also in December of
2005, Carl Cotten, a roofing specialist, advised the plaintiff or his agents to replace the roof.
<u>See</u> Docket Entry No. 87-17.[10]

It is the defendant's position that the plaintiff and Mr. Watry made "unprofessional,
cheap, slapdash 'repairs' by mopping over-the-counter cement on the already deteriorating
roof," which not only did not solve the problem of leaking and water damage to the roof
but also exacerbated the problem. Thus, the defendant argues that the exclusion from
coverage is designed to protect an insurer from this "exact situation--rewarding an insured
who refuses to be a responsible property owner." Docket Entry No. 87-1, at 15-16.

In his response, the plaintiff appears not to contest that there was decay,[11] but rather
maintains that the decay was "hidden from view" and concealed by sheetrock, paint, joints
and insulation on the bottom and tar paper with several layers of roofing tar on the top,
and that the building was regularly maintained and repaired as needed, with the "possible

---

[9] However, Mr. Watry appeared to testify that he had applied the roofing cement
that Mr. Hodge had observed <u>after</u> the storm. <u>See</u> Docket Entry No. 124-3, at 81.

[10] The defendant also cites the deposition of Ms. Jones in which she testified that
Mr. Watry was aware of the leaks in the roof, but that the plaintiff did not have the money
to replace the roof. Docket Entry No. 87-11, at 7. The plaintiff objected to this statement
of material fact, <u>see</u> Docket Entry No. 100, at 9, ¶ 34, on the basis of hearsay and counsel's
leading the witness, and denied that Mr. Watry admitted that there were problems with
the roof prior to the storm, patched it and did not replace the roof because there was not
enough money, citing in general to Mr. Watry's testimony, without citing to any specific
portion of his testimony. The Court has reviewed the excerpts of Mr. Watry's deposition
transcript, attached to Docket Entry No. 110, and could not find any mention of what he
had or had not told Ms. Jones.

[11] In fact, the plaintiff admits that "unseen 'sheathing deterioration' contributed to
the roof and ceiling sudden collapse." Docket Entry No. 100, at 6, ¶ 18.

exception of one small leak," and there were no leaks since April of 2008, and only a few leaks prior to that time that were repaired. Docket Entry No. 115, at 4.

The defendant argues that Mr. Watry has "flatly contradicted" his deposition testimony in his affidavit. Docket Entry No. 119, at 2. Specifically, the defendant maintains that Mr. Watry testified in his deposition that he regularly saw water ponding on the roof, in some places up to 4 inches," that there had been leaks in three of the units that he indicated were "again leaking profusely" on January 27, 2009, and that he observed the plywood sheathing from the roof to be "much deteriorated" on January 27, 2009. Docket Entry No. 119, at 2-3. However, Mr. Watry did not testify in his deposition that he regularly saw water ponding on the roof "in some places up to 4 inches" prior to January 27, 2009. Instead, as a "rough guess," he testified that there were some areas of the roof in which there were three to four inches of water <u>after</u> the storm. Docket Entry No. 124-3, at 83. Although he testified in his deposition that he observed the plywood sheathing from the roof to be "much deteriorated" after January 27, 2009, he did not testify that he had observed it to be deteriorated before the storm. <u>Id.</u> at 102.

In his affidavit, Mr. Watry attested that, prior to January 27, 2009, he did not have notice of knowledge that the roofing plywood was "itself deteriorated in any way" nor did he notice any "rotten, deteriorated, cracked, moldy or otherwise structurally unsound plywood sheathing." Docket Entry No. 112-2, at 2-3, ¶ 10. He also attested that the building had "a small number of leaks over the years," but that they were "not serious or out of the norm for this type of structure," and each leak was timely repaired. <u>Id.</u> at 2, ¶¶ 5-6. According to Mr. Watry, other than a few "small leaks," leaving "small water marks on the ceilings of some of the units," he had never observed any problem with the ceiling of any unit, and he was aware of no leaks after April of 2008, until January 27, 2009. <u>Id.</u> at 2, ¶¶ 7-8. He described the building as "well maintained" with "regular upkeep and maintenance performed." <u>Id.</u> at 2, ¶ 9.

While the defendant can certainly attack Mr. Watry's credibility in conceding that the sheathing was deteriorated after the storm but professing to have no knowledge of such deterioration before the storm, his affidavit does not "flatly contradict" his deposition testimony.    The evidence before the Court shows that the roof had problems and needed to be replaced.  However, the issue is not whether the roof was imperfect, which it clearly was, or whether the plaintiff was as responsible a landlord as he should have been, but rather whether the decay was known to the plaintiff or his agents prior to January 27, 2009.  Based on the record before the Court, the Court finds that there are genuine issues of material fact about the plaintiff's knowledge of the decay prior to January 27, 2009, and whether the decay was "hidden from view."

C.  Weight of Rain

The defendant argues that the affidavit of its engineering expert, Matthew Hodge, clearly supports its assertion that the weight of the rain did not cause any collapse.  In his affidavit, Mr. Hodge attested, inter alia, as follows:

> The roof failure was not caused by windstorm, hail, sinkhole collapse, falling objects, weight of snow, or water damage (defined by the Policy to mean accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the premises and contains water or steam.) . . . For the reasons set forth above, the sheathing was compromised long before the storm.  That is why it is important for his roof to have been replaced long before this storm.  A normally maintained roof should have been able to withstand this event. . . . If the roof had been properly maintained, or replaced, the water and/or ice should have had no adverse effects on the roof.

Docket Entry No. 87-6, at 6-7, ¶¶ 29 and 31.

Mr. Hodge opined that the failure of the roof sheathing "allow[ed] a large amount of water into the apartments," that the rotten plywood failed "under the long term pressure of the ponding water and any ice . . . as well as the additional water from the Storm" "loaded the deteriorated roof sheathing beyond its capacity, which was inhibited due to the

long-term moisture intrusion," and that "[n]o part of the roof rafters collapsed, abruptly fell down, or caved in during or after the Storm." Id. at 87-6, at 6, ¶¶ 24-26.

In a cursory manner, the plaintiff contends that there is "ample evidence of 'weight of rain' causing the collapse," given the testimony of the "heavy rain storm that lasted for days on a flat roof with four 'scuppers,'" along with Mr. Amick's description of the "sudden collapse resulting in a 'waterfall.'" Docket Entry No. 115, at 4.

Whether the weight of the rain caused the failure of the roof is really an extension of the defendant's contention that the poor condition of the roof was the cause of its failure. That contention has already been addressed above in the context of whether there was hidden decay.

## VII. Tennessee Consumer Protection Act Claim[12]

In his complaint, the plaintiff alleges that:

> Lloyd's, through its agents, deceived Schauffert into believing he had coverage under the policy. Schauffert relied on the representations of coverage to his detriment, causing Schauffert to incur damages, delays, and expenses he would not otherwise have experienced or incurred. These include, but are not limited to, the delay in beginning construction, the unnecessary damage caused by Braun, loss of income from rents, storage costs, additional construction costs to meet applicable Metro Code requirements in rebuilding the portions of the building destroyed by Braun, and fees and costs associated with Metro Code Requirements.

Docket Entry No. 1-1, at 7, ¶ 19. The plaintiff asserts that those acts constitute violations of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(b)(2), (3), (5), and (27). Id. at 8. The defendant maintains that the plaintiff's TCPA claim, based on Lloyd's deceiving the plaintiff into believing that he had coverage under the policy, should be dismissed because the plaintiff's agent, Cathy Watry, admitted she was advised

---

[12] The defendant also seeks summary judgment on the plaintiff's business income/loss of rents claim for the same reason it seeks summary judgment on the plaintiff's other damages claims. Since the analysis is the same as the coverage analysis, see Docket Entry No. 87-4, at 22, ¶ 64, the Court has not separately addressed this issue.

by the plaintiff's insurance agent that the policy might not provide coverage for the roof, and because the claim was denied based on valid policy provisions and the opinion of its expert.

The TCPA prohibits various unfair and deceptive practices and "any other act or practice which is deceptive to the consumer or to any other persons." Tenn. Code Ann. § 47-18-104(b)(27). The Tennessee Supreme Court has held that this "catch-all" provision may apply to the denial of an insurance claim. Myint v. Allstate Ins. Co., 970 S.W.2d 920, 925 (Tenn. 1998).[13] However, mere denial, even a mistaken or erroneous denial, of a claim is not a violation of the TCPA, absent any deceptive misleading or unfair act. See Williamson v. Aetna Life Ins. Co., 481 F.3d 369, 378 (6th Cir. 2007); Parkway Assocs., LLC v. Harleysville Mut. Ins. Co., 129 Fed.Appx. 955, 960-61 (6th Cir. May 4, 2005); Hardy & Kelly LLC v. QBE Ins. Corp., 2011 WL 1539888 (M.D. Tenn. Apr. 22, 2011) (Campbell, C.J.); Fulton Bellows, LLC v. Federal Ins. Co., 662 F.Supp.2d 976, 997 (E.D. Tenn. 2009). See also Chad Youth Enhancement Ctr., Inc. v. Colony Nat'l Ins. Co., 2010 WL 455252, *5 (M.D. Tenn. Feb. 2, 2010) (Echols, J.).

The plaintiff maintains that the defendant did "much more than simply deny Plaintiff's legitimate claims." Docket Entry No. 115, at 6. Specifically, the plaintiff argues that the defendant disregarded its own expert's report supporting a finding that the roof had collapsed and refused to properly investigate the loss or provide its expert with statements from Ms. Jones, Ms. Watry, Mr. Watry, Mr. Brent, the plaintiff and the prior owner. In addition, the plaintiff contends that the defendant's "authorized representative adjuster also ran around assuring everyone the loss was covered," and that the defendant

---

[13] Although subsequent courts have implied that section (b)(27) is the only section of the TCPA under which a claim against an insurance company can be brought, see, e.g., Fulton Bellow, 662 F.Supp.2d at 997, it does not appear that the Tennessee Supreme Court was quite as limiting in Myint. Regardless, however, the parties have not addressed any particular section of the TCPA in their memoranda in support of or opposition to the defendant's motion for summary judgment.

"demanded their adjuster, Mr. Espey, lie in his dealings with Lloyd's insureds--which he testified he was willing to do." Id. at 6 (emphasis in original). The defendant did not address the TCPA in its reply (Docket Entry No. 119) or otherwise contend that, if proven, the conduct described by the plaintiff does not fall within the ambit of T.C.A. § 47-18-104(b)(27).

The plaintiff offers no explanation for why the defendant's investigation was improper or why failure to provide its expert with statements supports a violation of the TCPA. The plaintiff maintains that Mr. Espey was willing to lie for Lloyd's, citing Mr. Espey's "deposition testimony where this is explicitly stated." Docket Entry No. 115, at 6. The plaintiff did not cite to any specific pages of Mr. Espey's 122 page deposition transcript. Although there is no obligation to do so, the Court scoured the transcript in an attempt to locate any testimony in which Mr. Espey made such a representation. The Court assumes that the plaintiff was referring to his testimony that, after he had been notified that the plaintiff's claim was denied, he was directed by the third-party administrator to advise the plaintiff or his agent that he was still awaiting a response on whether the claim would be covered if the insured asked about coverage before receiving the notice of denial. Docket Entry No. 124-7, at 84-86. Such testimony does not support any contention that Mr. Espey lied in this dealings with the plaintiff.

The real gravamen of the plaintiff's TCPA claim appears to be his contention that Brad Espey, the insurance adjuster for GAB, which had been contacted by the third party administrator for defendant Lloyd's,[14] had told Ms. Watry that there would be insurance coverage.

The plaintiff did not specifically dispute the defendant's citations to the deposition of Cathy Watry in support of its contention that Mr. Espey had advised Ms. Watry that

---

[14]  Mr. Espey explained that it was his understanding that CJW, the third party administrator for defendant Lloyd's, issued an assignment to GAB. Docket Entry No. 124-7, at 12-13.

there might not be coverage. However, the portions of Ms. Watry's deposition testimony cited by the defendant only confirmed that Mr. Espey advised her that the "roof" might not be covered, but she also testified that Mr. Espey told her "everything else is covered." Docket Entry No. 123-1, at 141; Docket Entry No. 128, at 11-12.

In his deposition, Mr. Espey denied having made any representations to anyone about whether any repairs would be covered under the policy. See Docket Entry No. 124-7, at 23, 25, 38-40, 43-44, and 46-48. On the other hand, Mark Easterwood, Braun's project manager, attested in his affidavit that Mr. Espey advised him and Jim and Cathy Watry that the temporary roof and emergency services and repairs would be covered under the policy and that the "only part of the Property possibly not covered by the Policy was the permanent roof." Docket Entry No. 36, at 2, ¶¶ 7 and 10. However, in his deposition, Mr. Easterwood repudiated and/or testified that he did not remember the basis for some of his prior statements in his affidavit, but he did confirm that Mr. Espey had told him that the "temporary roof was covered," and that coverage for "emergency services," specifically the temporary roof, was "not in question." Docket Entry No. 124-9, at 42, and 44-45.

Based on Mr. Easterwood's affidavit, Mr. Espy's deposition, and Ms. Watry's deposition, there are genuine issues of material fact about whether or not Mr. Espey made representations to Mr. Easterwood and the Watrys that all or part of the repairs would be covered under the defendant's insurance policy. Therefore, dismissal of the plaintiff's TCPA claim is not warranted.


## VIII. Conclusion

While the defendant may ultimately prevail in this case, the Court must consider the affidavits and deposition testimony in the light most favorable to the plaintiff, without making the credibility judgments the defendant urges. Matsushita, 475 U.S. at 587-88; Pennington, 553 F.3d at 450; Van Groder, 509 F.3d at 268; Myers, 341 F.3d at 466; Hopson,

306 F.3d at 432. Following that mandate, the Court finds that there are genuine issues of material fact that preclude granting summary judgment to defendant Lloyd's.

RECOMMENDATION

For the reasons provided above, it is recommended that the motion for summary judgment filed by defendant Certain Underwriters at Lloyd's, London (Docket Entry No. 87) be DENIED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice, and must state with particularity the specific portions of this Report & Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


_____
JULIET GRIFFIN
United States Magistrate Judge