UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ALEX SHAUFERT, | ) |
| | ) |
|     Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | )   No. 3:09-00510 |
| | )   Judge Sharp |
| CERTAIN UNDERWRITERS AT | ) |
| LLOYD'S, LONDON, GAB ROBINS | ) |
| NORTH AMERICA, INC. and BRAUN | ) |
| CONSTRUCTION SERVICES, INC., | ) |
| | ) |
|     Defendant/Counter-Plaintiff. | ) |

## MEMORANDUM

On May 9, 2011, the Magistrate Judge entered a Report and Recommendation ("R & R") (Docket No. 147) recommending that the Motion for Summary Judgment filed by Defendant Certain Underwriters at Lloyd's, London ("Lloyd's") (Docket No. 91) be denied. Lloyd's has filed Objections to the R & R (Docket No. 148). Having conducted the *de novo* review required by Fed. R. Civ. P. 72(b)(3), the Court finds that the Magistrate Judge did not err in her recommendation and, accordingly, Lloyd's Objections will be overruled, and its Motion for Summary Judgment will be denied.

## I. DISCUSSION

On January 27, 2009, the roof of Building A, a two-story apartment structure at the Shannondale Apartments in Madison, Tennessee, failed during a storm. The apartments were insured by Lloyd's and owned by Plaintiff, Alex Shaufert, who filed suit against Lloyd's[1] claiming

---

[1] Plaintiff also brought suit against the local adjuster, GAB Robins North America, Inc., and Braun Construction Services, which did emergency repairs to the building.

1

that the roof collapsed because of collected rain and ice. He also claimed that the breached roof caused extensive damage to the underlying apartments. Lloyd's moved for summary judgment arguing that the Policy did not provide coverage because the water intrusion was the result of ponding and/or roof failure as a result of pre-existing damage and deterioration of which Plaintiff was aware.

The Policy at issue generally excludes collapse, "except as provided . . . in the Additional Coverage for Collapse." (Docket No. 87-5 at 33). The "Additional Coverage – Collapse" section, in pertinent part, provides that a "Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (Id. at 36). The Policy goes on to provide:

> 2. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage form if the collapse is caused by one or more of the following:
>    *        *        *
>  b. Decay that is hidden from view, unless the presence of such decay
>  is known to any insured prior to collapse;
>    *        *        *
>  e. Weight of rain that collects on a roof . . . .

(Id. at 36).

The Magistrate Judge ruled that genuine issues of material fact existed on Plaintiff's breach of contract claim regarding whether there was a collapse and whether such a collapse resulted from hidden decay and/or the weight of the rain on the roof. The Magistrate Judge also ruled that there was a genuine issue of material fact as to whether Lloyd's deceived Plaintiff into believing there was coverage under the policy in violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq*.

## A. Collapse

As support for its contention that there is no evidence of a collapse, Lloyd's submitted an Affidavit from William H. Hodge ("Hodge"), a forensic and professional engineer, who is supposed to be *Plaintiff's* expert. In his Affidavit, Hodge stated that (1) the underside of the roof rafters and/or sheathing, as well as the drywall of several of the apartments, had mold growth; (2) the plywood sheathing was rotten and moldy in many areas due to a lack of maintenance, age, wear and tear, corrosion, fungus, decay, deterioration, cracking, and mold; (3) the sheathing was completely rotted away in some areas; (4) the leaks, mold, cracks, wear and tear, and rotten condition of the roof sheathing indicated a long-term problem that developed over time and before the storm; and (5) "[n]o part of the roof rafters collapsed, abruptly fell down, or caved in during or after the storm." (Docket No. 87-6, Hodge Aff. at ¶¶ 8, 16, 18-22 & 26).

In Lloyd's view, Hodge's Affidavit should be dispositive on the issue of collapse, particularly since "[t]he Magistrate's Report, itself, states (1) Plaintiff testified in his deposition that he was unaware of any collapse; (2) Plaintiff's own property manager, Cathy Watry, testified that she did not see any collapse; and (3) Plaintiff's maintenance man, James Watry, admitted that there was no collapse." (Docket No. 148 at 2). Lloyd's argues the Magistrate Judge's conclusion that the deposition testimony of those individuals does not serve as admissions "is not reflective of the summary judgment standard." (Id.).

While Lloyd's paraphrases language from the R & R in which the Magistrate Judge recounts Lloyd's arguments, her actual ruling was:

> Ms. Watry testified that she arrived at the building after the storm and she did not see an "abrupt falling in" of any part of the roof or the building but she explained that the "roof had to have collapsed for that much water to be coming through the ceiling." . . . Mr. Watry testified that he did not notice any holes or see where the

3

> roof had collapsed. . . . The plaintiff did not view the building until after Braun had performed repairs and had no first hand knowledge of what happened. The Court cannot find that the deposition testimony of Ms. Watry, Mr. Watry, and the plaintiff serve as admissions that the roof did not collapse.

(Docket No. 147 at 12-13, internal citation omitted). The Court agrees with the Magistrate Judge that such testimony hardly constitutes an admission – the most it shows is a possible lack of personal knowledge of whether the roof collapsed.

Regardless, as the one seeking coverage under the policy, it is incumbent upon Plaintiff to establish a covered event, Mass. Mut. Life Ins. Co. v. Jefferson, 104 S.W.3d 13, 22 (Tenn. Ct. App. 2002), and, in the context of Lloyd's' Motion for Summary, to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

Plaintiff has set forth evidence from at least two sources which could lead a reasonable jury to conclude there was a "collapse" within the meaning of the policy. Mattie Jones ("Jones") is a Property Standards Inspector for the Metropolitan Government of Nashville who, along with her supervisor, went to the Shannondale Apartments on the morning of the storm. In her deposition, Jones testified that she and her supervisor entered one of the apartments and saw that it "didn't have any ceiling. It had collapsed in." (Docket No. 124-11 at 54). She further testified that "all the sheetrock had collapsed in," and that she "saw some damaged rafters." (Id. at 55). Jones also testified that in one "particular guy's apartment not only had the ceiling collapsed, the actual sheetrock collapsed down" and that "the light fixtures were hanging down on pigtails." (Id. at 67). She further stated that the sheathing and parts of the plywood decking had collapsed and that the plywood had "rotted out in places[.]" (Id. at 67-68). Finally, Jones testified that the damage was

4

so bad that she had to ask the tenants to leave and to post the building as uninhabitable (Id. at 48 & 63).

The allegedly abrupt nature of the failure is further supported by the Affidavit of Kenneth Amick ("Amick"), who, at the time of the storm, resided in a second story apartment in Building A. In his Affidavit, Amick states:

> 10. On January 27, 2009, I was up early for work as usual. It was about 3:30 a.m. and I was in my bathroom.
>
> 11. It had been raining hard since the previous day but there were no drips, leaks, water stains or any other problems with the ceiling or walls of my apartment that I noticed on January 26, 2009, despite being home the evening of the 26th and morning of the 27th up until 3:30 a.m. as I described above.
>
> 12. As I was getting ready for work at about 3:30 a.m. on January 27, 2009 a [sic] heard a loud and sudden crashing sound that came from my apartment living room followed by the sound of water gushing and landing on the living room floor in the area of the crashing sound.
>
> 13. I immediately went into the living room and saw a large piece of sheetrock, approximately three feet by five feet and a large amount of other material including what appeared to be insulation laying on the living room floor with water streaming from the ceiling directly above the ceiling and other materials laying in the living room floor.
>
> 14. I tried to collect the water as best I could using buckets/pans placed under the large hole in the ceiling where the water continued to rush in. This was no "leak" as any reasonable person would think of one, it was more like a waterfall that would not stop.

(Docket No. 95, Amick Aff. ¶¶ 10-14).

In its Motion for Summary Judgment, Lloyd's characterized Amick's affidavit as "self-serving" and "simply not believable." (Docket No. 119 at 2). The Magistrate Judge rejected those assertions as unsupported by the record, and Lloyd's does not challenge that finding now. Instead, Lloyd's contends the Magistrate Judge committed error in even considering the Affidavit.

5

In the R & R, the Magistrate Judge wrote that "[w]hether Mr. Amick's affidavit, DVD,[2] or his testimony can be used by the plaintiff is not an issue for the Magistrate Judge in the context of considering the defendant's motion for summary judgment, and the Court's consideration of his affidavit and declination to access the DVD are not intended to suggest or prejudge whether they would be admissible at trial." (Docket No. 147 at 3). Lloyd's argues this was plain error, writing:

> . . . Such a recommendation, however, fails to comply with the summary judgment standard set forth in Fed. R. Civ. P. 56, as Rule 56 (e)(1), which requires a supporting affidavit to be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." . . .
>
> As a result, under Fed. R. Civ. P. 56, the Magistrate's Report cannot make the recommendation that Underwriters' summary judgment motion be denied, finding that an issue of material fact exists as to whether there was a collapse, when this recommendation is primarily based on the purported evidence of the Amick affidavit, of which the Magistrate expressly declined to determine admissibility. If the Magistrate Judge cannot make a recommendation as to the admissibility of the Amick affidavit, it certainly cannot rely on the Amick affidavit as one of the main grounds to recommend that Underwriters' summary judgment be denied.

(Docket No. 148 at 4-5, internal citations omitted).

Contrary to Lloyd's assertion, the Magistrate Judge committed no error. She is not the trial judge assigned to this case, but rather had the matter referred to her for a R & R. The Magistrate Judge merely pointed out the obvious – it was not within her bailiwick to determine the ultimate admissibility of any evidence at trial, including evidence from Amick.

As for whether Amick's Affidavit complied with Rule 56(e), the Magistrate Judge specifically found that "he was a tenant in one of the units in building A," and that "he was at home when the roof failed on August [sic] 27, 2009, and attested in his affidavit to his observation."

---

[2] After the storm, Amick recorded the damage to his apartment with his cellphone and that recording was transferred to a DVD. Like the Magistrate Judge, the Court has not considered the DVD in ruling on Lloyd's Motion for Summary Judgment.

(Docket No. 147 at 3). The Magistrate Judge also addressed Lloyd's contention that Amick was not properly disclosed, noting that he and several other tenants were listed by name in Plaintiff's initial Rule 26(a)(1) disclosures and in response to interrogatories, that Amick was apparently equally available to all parties in the litigation, and that "[s]ecuring the affidavit of a witness, identified in the plaintiff's initial disclosures and in the plaintiff's responses to written discovery, who was not deposed by either the plaintiff or the defendant, is not discovery, and there are no grounds to exclude his affidavit since he was previously disclosed by the plaintiff." (Id.). In its Objections, Lloyd's maintains that the information which Amick supplies was not properly disclosed.

As noted, Amick was identified in the initial disclosures and in the responses to interrogatories as one of seven tenants in Building A. The interrogatory responses indicated that the "Tenants will testify about the condition of the building and their being required to move after the loss due to the action of Braun and the requirements of the Metro Codes." (Docket No. 122-6 at 3 & 4). Despite these disclosures, Lloyd's argues "the subject matter of the tenants' knowledge is limited temporally to the condition of the building *after the loss*," "there is no indication that any of the tenants would be testifying that they actually witnessed a roof collapse," and "[i]f such late disclosure of the subject matter of the knowledge of testifying witnesses is allowed, it will be necessary for litigants to exhaustively to [sic] depose every remote potential witness identified by the opposing party in order to avoid the substantial risk of future prejudice." (Docket No. 148 at 6, italics in original).

The Court does not agree that the tenants' possible testimony was only forward-looking, or with the parade of horribles envisioned by Lloyd's. It is hardly remote that a tenant who "will testify about the condition of the building," might have pertinent information about an alleged roof

7

collapse which occurred sometime around 3:00 in the morning. Nor would it require a herculean effort for Lloyd's to simply call or personally interview the seven tenants in an effort to determine whether they were at home when the "collapse" occurred and ask them what they saw, if anything.

In sum, the evidence from Jones[3] and Amick, if believed, could lead a reasonable jury to conclude there was "an abrupt falling down or caving in" of the roof "with the result that the building or part of the building [could not] be occupied for its intended purpose," as required by the Policy language. Accordingly, Lloyd's objections to the Magistrate Judge's conclusion that genuine issues of fact surround whether there was a collapse of the roof on January 27, 2009, will be overruled.

## B. Hidden Decay and Weight of Rain

In the R & R, the Magistrate Judge found "there are genuine issues of material fact about the plaintiff's knowledge of the decay prior to January 27, 2009, and whether the decay was 'hidden from view.'" (Docket No. 147 at 18). The Magistrate Judge also wrote that "[w]hether the weight of the rain caused the failure of the roof is really an extension of the defendant's contention that the poor condition of the roof was the cause of its failure," and, therefore, for the reasons set forth in her conclusion regarding a hidden defect, genuine issues of material fact existed so as to preclude summary judgment on the weight of rain issue. (Id. at 19).

With regard to a hidden defect, Lloyd's argues "[t]here is uncontroverted proof in the record that prior to even purchasing the Property, Shauffert was advised that '[t]he most significant repair issue on the buildings is the flat portion of the roof on each of the two buildings . . . Several tears were noticed in the roofing material on the flat portions of the roof. Water was ponding several

---

[3] The Court is fully aware that Jones testified in her deposition that she believed the "collapse" occurred because of neglect by the owner. That belief, of course, goes to the issue of whether there was a hidden defect.

8

inches deep on a good portion of the flat surface. . . . Several roof leaks were noted in second level units."'" (Docket No. 148 at 8).

The internal quoted language upon which Lloyd's relies for its "uncontroverted proof" is from a report prepared by Advantage Home Inspection which was provided to Plaintiff prior to closing. While the report does note some tears in the roofing material and ponding water, it says nothing about hidden structural defects. In fact, in language not quoted by Lloyd's, the report is prefaced with the observation that "[n]o major structural issues were noted at the time of the inspection," (Docket No. 87-14 at 6), and the report could be read to indicate that the roof leaks were the result of the torn roofing material, not a hidden defect in the roofing structure. As such, the Advantage Home Inspection report is hardly definitive on the issue of whether Plaintiff knew about hidden defects in the roof, particularly since Plaintiff testified in his deposition that he received the report, understood that some repairs needed to be made, and $1,800 was credited for the necessary repairs to the roof. (Docket No. 87-9 at 3-4 & Docket No. 119-4 at 5).[4]

Lloyd's also points to Hodge's Affidavit in support of its position that the defects were not hidden and the roof failure was not the result of heavy rain. In his Affidavit, Hodge stated that he inspected Building A on January 29, 2009, two days after the storm and (as already indicated) found numerous problems with the roof. In Hodge's expert opinion,

> 23. This roof was past the point of repairs and required replacement prior to

---

[4] In support of its Motion for Summary Judgment, Lloyd's also relied upon the Affidavit of Carl Cotten, Sr. ("Cotten"), a longtime roofer who was contacted by a realtor to inspect the roof of Building A in connection with the sale to Plaintiff. Cotten claims the roof was in "very poor condition," and he "spoke by telephone about [his] observations to a man who was in some way a representative of the building," telling him "that the roof was not worth repairing" and "needed to be replaced." (Docket No. 87-17, Cotton Aff. ¶¶ 2, 4-5). This is of little evidentiary value in determining Plaintiff's knowledge since Cotten cannot say for sure if he spoke to Plaintiff, and Lloyd's does not designate material which shows that Plaintiff acknowledged having that conversation with Cotten.

9

the Storm. Anyone who conducted a roof inspection or walked on top of the roof should have noticed the wear and tear and other lack of maintenance and deterioration existent in the sheathing. The longstanding leaks and the interior sheetrock repair made by the maintenance man also should have made the poor condition of the roof known.

24. During or after the Storm, the worn, rotten roof sheathing failed, allowing a large amount of water into the apartments.

*   *   *

27. The roof sheathing was in very poor condition prior to the start of the winter due to repeated and long-term moisture intrusion and mold growth.

28. Because the roof was not sound, it was much more susceptible to damage from the pressure of the water. Wind did not contribute to or cause the roof failure or allow water to enter the Property during or after the storm.

(Docket No. 87-6, Hodge Aff. ¶¶ 23-24 & 27-28).

Were it uncontradicted, Hodge's Affidavit would be strong proof that any defects were obvious, that heavy rain did not cause the failure, and that the roof failed as the result of poor maintenance and a decision not to replace a worn-out roof. However, as the Magistrate Judge properly observed, there is other evidence in the record which, when construed in Plaintiff's favor, raises genuine issues as to whether there were hidden defects, and whether those defects caused the roof to fail during a heavy storm.

For example, Plaintiff submitted an Affidavit from James Watry ("Watry"),[5] the maintenance man at Shannondale Apartments, who stated that he has done various kinds of maintenance and

---

[5] The Magistrate Judge specifically addressed and rejected Lloyd's arguments that Watry's Affidavit should not be considered because it supposedly contradicts his prior deposition testimony. (Docket No. 147 at 17). In its Objections, Lloyd's made no effort to show that the Magistrate Judge was incorrect in her analysis of the record. Nevertheless, the Court has reviewed Watry's 172-page deposition (Docket No. 124-3) in conjunction with his Affidavit and finds no direct contradiction such that the Affidavit was submitted in an effort "to create a sham issue of material fact." Aerel, S.R.I. v. PCC Airfoils, LLC, 448 F.3d 899, 908 (6th Cir. 2006).

10

repair work on the property since Plaintiff purchased the apartments in January 2006. Watry stated that there were only a small number of roof leaks during the years he worked on Building A before the storm, and that "[t]he leaks were not serious," "otherwise out of the norm for this type of structure," and were timely repaired. (Docket No. 112-2, Watry Aff. ¶¶ 5-6). Watry also indicated that, as a part of his maintenance duties, he had been in each of the apartments on numerous times to inspect the units for problems and that he observed no problems other than a few small leaks, none of which occurred after April 2008. (Id. ¶¶ 7-8). When he did repair the drywall ceiling where a leak was found, Watry claims he never observed "any rotten, deteriorated, cracked, moldy or otherwise structurally unsound plywood sheathing." (Id. ¶ 11). Finally, Watry stated that "Building A was well maintained and had regular upkeep and maintenance performed." (Id. ¶ 9).

Additionally, Plaintiff submitted an Affidavit from Ransom Brent ("Brent"), a tenant in Building A. Brent assisted Watry in his maintenance duties, and confirmed much of what Watry had to say about the condition of the roof. In his Affidavit, Brent stated:

> 6. I have done roofing maintenance work for the previous owners of Shannondale Apartment and for Alex Shauffert through Cathy Watry. This would include some patching work with roof cement and doing a complete re-tarring of the roof about every 3 years. During the occasions I was on the roof I never noticed any soft spots or other indications that the roof was anything but structurally sound. The roof was firm and appeared over all to be in good and normal shape.
>
> 7. The building had a small number of leaks over the years leading up to the January 27, 2009 collapse of the roof.
>
> 8. These leaks were not serious or otherwise out of the norm for this type of structure. Each of these leaks were timely repaired by myself with the assistance of James Watry. He would do the work inside the apartment and I would do the work on the roof.
>
> 9. There were no leaks that I am aware of after April of 2008 and up until January 27, 2009 when the collapse occurred.

> 10. Building A was well-maintained and had regular upkeep and maintenance performed. I would have liked to have new carpeting in my apartment but other than that I considered my apartment and the building as a whole to be well maintained while I lived there.

(Docket No. 112-3, Brent Aff. ¶¶ 6-10). Further, in his deposition, Brent testified that when he applied a slurry to the roof in April 2008, he was on the roof for eight hours, and he did not think that the roof need to be replaced. (Docket No. 124-13 at 21 & 37).

Watry's and Brent's observations clearly call into question Hodge's observation that the defects in the roof were noticeable. Even though Watry and Brent lack Hodge's educational credentials, they are in a position to testify as to their own observations and were, for all intents and purposes, Plaintiff's eyes on the scene in relation to the condition of the roof. Moreover, both Watry and Brent have backgrounds in construction – Watry was in the construction business for forty years and Brent was a roofer for ten years. (Docket Nos. 124-3 at 17 & 124-13 at 12).

Since Lloyd's concedes a "heavy rainstorm exacerbated ongoing problems,"[6] and there are questions whether any such problems were known by Plaintiff, the Magistrate Judge properly ruled that summary judgment was inappropriate on the issue of hidden defect and/or the weight of rain issues.

## C. TCPA Claim

The Magistrate Judge found that genuine issues of material fact exist on Plaintiff's TCPA claim under the "catch-all provision" of the Act which prohibits "any other act or practice which is deceptive to the consumer or to any other person," Tenn. Code Ann. § 47-18-104(b)(27), and which

---

[6] In its moving papers, Lloyd's writes: "In a word, the Plaintiff had a rotting roof, and he failed to maintain it properly. A heavy rainstorm occurred, exacerbated the already ongoing problem of ponding water, and the roof could no longer do its job." (Docket No. 87-1 at 11).

12

the Tennessee Supreme Court has indicated applies to deceptive practices by insurance companies. Mint v. Allstate Ins. Co., 970 S.W.2d 920, 926 (Tenn. 1998). In its objections, Lloyd's quotes from one paragraph of the R & R, claiming that paragraph "makes three (3) things clear: (1) Though Plaintiff based its entire TCPA claim on Mr. Espey's[7] conduct, Plaintiff cited no evidence to support its bare allegations of same; (2) even though the Magistrate Judge had no responsibility to do so, she "scoured" the record and could find no evidence to support Plaintiff's bald TCPA allegations; and (3) though the Magistrate Judge found only one statement by Mr. Espey that could even arguably be construed as possibly deceptive, the Magistrate Judge still found that 'such testimony does not support **any contention** that Mr. Espey lied' to Plaintiff." (Docket No. 148 at 15, emphasis supplied by Lloyd's).

The Court need not tarry over this objection because the paragraph which Lloyd's quotes deals with the issue of whether Plaintiff could establish that Espey was willing to lie for Lloyd's about his knowledge of a denial letter.[8] Moreover, Lloyd's pointedly fails to address the immediately following paragraphs in the R & R in which the Magistrate Judge sets forth the specific reasons for her recommendation that summary judgment be denied on the TCPA claim. The Court has considered those paragraphs in conjunction with the cited portions of the record and agrees with the Magistrate Judge that "[b]ased on Mr. Easterwood's affidavit, Mr. Espey's deposition, and Ms. Watry's deposition, there are genuine issues of material fact about whether or not Mr. Espey made

---

[7] Brad Espey ("Espey") is an insurance adjuster employed by Defendant GAB, an independent company that was contracted to provide adjusting services on behalf of Lloyd's.

[8] In his deposition, Espey testified that he received an e-mail from Tom Berardo, an account manager for CJW Associates, a third-party insurance claims administrator. Attached to the email was a copy of the denial letter and Espey was instructed in the email as follows: "If you receive any calls before they [Plaintiff or his representatives] receive the letter advise them that you are waiting on response from London. If you receive any calls after they receive the letters, refer them to me." (Docket No. 124-8 at 115).

representations to Mr. Easterwood and the Watrys that all or part of the repairs would be covered under the defendant's insurance policy." (Docket No. 147 at 22).

## II. CONCLUSION

On the basis of the foregoing, the Court will enter an Order accepting and approving the R & R, overruling Lloyd's Objections thereto, and denying Lloyd's Motion for Summary Judgment.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE